IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| In the Matter of the Seizure of Cryptocurrency on a Black Trezor Device Seized on June 11, 2025 | Case No. 2:25mj859-DAO |
| In the Matter of the Seizure of All Funds in Certain Santander Bank Accounts Ending in x7804, x7812, 7847 | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEIZURE WARRANT**

I, Jonathan Helmstetter, Special Agent, IRS Criminal Investigations("IRS-CI"), being duly sworn, declare and state as follows:

**PURPOSE OF THE AFFIDAVIT**

1.      I make this affidavit in support of an application for the issuance of a seizure warrant to seize the following funds (the "TARGET FUNDS"):

- All funds in Santander account ending in x7804 in the name of Exseedingly Consulting, Inc. up to $5,334,978.91;

- All funds in Santander account ending in x7812 in the name of Global Office Group, Inc. up to $305,000;

- All funds in Santander account for Trusted Transportation Group Inc. ending in x7847 up to $322,661.82

- All cryptocurrency in a black Trezor wallet seized from Joseph Mori's ("Mori") home on June 11, 2025, which was used for Exseedingly's cryptocurrency exchange business including:

  - Up to 0.433157 BTC

  - Up to 6,544.68 Tether USDT (Ethereum Blockchain)

  - Up to 506.0188 USDC (Ethereum Blockchain)

  - Up to 25.1978 ETH

  - Up to 5,005 USDT (Polygon Blockchain)

  - Up to 1,555 USDT

2.    For the reasons specified below, there is probable cause to believe the TARGET FUNDS are subject to forfeiture and seizure as follows:

*Civil Seizure and Forfeiture*

a.  Pursuant to 18 U.S.C. § 981(a)(1)(C) because the TARGET FUNDS are property, real or personal, which constitute or are derived from proceeds traceable to violations of 18 U.S.C. §§ 1343 (Wire Fraud) and 15 U.S.C. §§ 78j(b) and 78ff(a), and 17 C.F.R. § 240.10b-5 (Securities Fraud). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. A "specified unlawful activity," as defined in § 1956(c)(7), includes offenses listed in 18 U.S.C. § 1961(1). Section 1961(1) includes Wire Fraud and Securities Fraud violations.

b. Pursuant to Section 981(a)(1)(A) because the Target Funds are property, real or personal, which were involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960.

c. Consequently, seizure of the TARGET FUNDS for civil forfeiture is authorized by 18 U.S.C. § 981(b).

*Criminal Seizure and Forfeiture*

d. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because the TARGET FUNDS are property, real or personal, which constitute or are derived from proceeds traceable to Wire Fraud and/or Securities fraud.

e. Pursuant to 18 U.S.C. § 982(a)(1) because the TARGET FUNDS were involved in one or more violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) (Concealment Money Laundering), 1956(h) (money laundering conspiracy), 1957 (spending), and/or 1960 (unlicensed money transmitting) or are traceable to such property.

3.     Consequently, seizure of the TARGET FUNDS for criminal forfeiture is authorized by 21 U.S.C. § 853(f) and 18 U.S.C. § 982(b)(1).

4.     In tracing funds for civil forfeiture, the United States may rely on 18 U.S.C. § 984.  This statute provides that it is not necessary for the Government to trace fungible property, like funds in a bank account, in connection with forfeiture proceedings commenced within one year of the date of the offense. Section 984 allows the Government to seize the full amount of illicit proceeds originally deposited into an account during the look back period regardless of whether the government can establish, such as through direct tracing, that the fraud proceeds remain in the account on the seizure date. As a result, under Section 984 the Government can seize more than just the directly traceable proceeds that remain in the account.

5.     A restraining order for the TARGET FUNDS under 21 U.S.C. § 853(e) would likely not adequately protect the property sought for forfeiture. Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve

the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds in an account are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served. Regarding the cryptocurrency sought for forfeiture from the trezor wallet, cryptocurrency can easily be moved and transferred. Wallets can be cloned and reconstituted, allowing any cryptocurrency in the wallet to be transferred to another wallet or spent in a transaction.

6.      Although Rule 41(b) of the Federal Rules of Criminal Procedure provides that the seizure warrant must be executed in the issuing district, other statutes authorize a magistrate to issue a warrant to seize property in any district. Under 21 U.S.C. § 853(l), district courts have jurisdiction to authorize a criminal seizure warrant under 21 U.S.C. 853(f) "without regard to the location of any property which may be subject to forfeiture." The same authority is granted for civil forfeiture seizure warrants under 18 U.S.C. § 981(a) by 18 U.S.C. § 981(b)(3). The accounts were opened in New York, and the trezor device is in the possession of the FBI in Utah.

## BACKGROUND OF AFFIANT

7.      I am a Special Agent with the Internal Revenue Service ("IRS"), Criminal Investigation ("IRS-CI"). I have worked for the IRS as a Special Agent since approximately May of 2009. My formal education includes a Bachelor of Science degree from Ramapo College of New Jersey where I majored in Accounting and minored in Computer Information Systems. In addition, I have received extensive training with respect to investigating tax crimes, money laundering, financial crimes, and other

criminal violations at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  During my continued employment as a Special Agent with IRS-CI, I have investigated several cyber-related cases to include business email compromises, computer intrusion, ransomware, cryptocurrency Ponzi schemes, and other related crimes.  I currently hold the designation of a Certified Anti-Money Laundering Specialist.

8.      I have conducted and participated in numerous investigations into mail and wire fraud, money laundering, and other financial and computer crimes.  As an IRS-CI Special Agent, I am familiar with the use of financial accounts by those who operate fraudulent schemes and the types of transactions reflected on financial records.  I am also familiar with the principles of tracing assets into ad through financial accounts, including the subsequent purchase of property using the originally traced assets.  I was also aided by Federal Bureau of Investigation ("FBI") Task Force Officer Scott Pugmire whose home agency is the Utah State Bureau of Investigation, Utah Department of Public Safety.

9.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other witnesses and agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested seizure warrant and does not set forth all of my knowledge about this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PROBABLE CAUSE

### A.  Summary

10.      As further described below, I have been working on an investigation into multiple schemes involving Joseph Mori, an individual residing in the State of New York, who received proceeds of a business email compromise against a Utah victim, and also

appears to be running a cryptocurrency investment fraud and Ponzi scheme online, successfully eliciting investments from many Utah residents. Mori has previously been convicted in the State of New York for forged instruments and by the Southern District of New York for participating in a fraudulent advance fee scheme.  He was under supervised release in the Southern District of New York throughout the period of the events described below.

### Money Laundering & Unlicensed Money Transmitting Connected to Business Email Compromise Schemes

11.     In October 2023, we received report that a Utah-based risk management company ("Victim 1") fell victim to a Business Email Compromise ("BEC") scam. A BEC is "a sophisticated scam targeting businesses that perform electronic payments such as wire or automated clearing house transfers. The scam is frequently carried out when a subject compromises legitimate business email accounts through social engineering or computer intrusion techniques resulting in an unauthorized transfer of funds." (ic3.gov, 2020)

12.     The following information was provided by representatives of Victim 1 and a law firm that was involved in settlement of a lawsuit with a Utah municipality. Victim 1 represented a Utah municipality in a civil suit brought by claimants. Victim 1 agreed to a settlement with the claimants for $779,600.00. Victim 1 received an email from what appeared to be the attorney representing the claimants with wiring instructions for the settlement funds. However, the email address that sent was spoofed by Unidentified Subjects by registering and using the email domain "tagteam**s**law**s**" (two additional

letters "s") to impersonate a person with an email address from the legitimate email domain "tagteamlaw.com."

13.    Wild West Domains, the domain registrar provided records indicating the perpetrators had registered one imitation domain "tagteamlaw**s**.com" on February 1, 2023, and the second imitation domain "tagteam**s**law**s**.com" on October 5, 2023.

14.    The fraudulent email included an attachment containing wiring instructions for the settlement funds on the claimant's attorney's letterhead. The fraudulent attachment instructed Victim 1 to send the funds to Global Office Group Inc., Thread Bank, 210 East Main Street, Rogersville, TN 37857, and account # XXXXXXXX1064.

15.    On October 26, 2023, Victim 1, following the fraudulent wiring instructions, wired $779,600.00 to the above Thread Bank account. This wire was to pay the agreed upon settlement amount. Shortly after the wire was sent, Victim 1 received notification from the claimant's attorney that the wire was never received. Upon further investigation, Victim 1 realized Global Office Group is unrelated to the previously referenced lawsuit and has no legitimate reason to receive money from Victim 1, and they had been victimized in a BEC scam.

16.    According to records received from Thread Bank, account # XXXXXXXX1064 is registered to Global Office Group Inc., 31 Edge Hill Road, Wappingers Falls, NY, 12590. This address is a residential home, with Joseph Mori as its principal. A photo of the home from publicly available sources is included below as Figure 1.



*Figure 1- 31 Edge Hill Road, Wappingers Falls, NY, 12590*

17.     A publicly available internet search of the New York State, Division of Corporations website for Global Office Group Inc., returned an active domestic business corporation listing, #5591281 (Figure 2 below). The initial filing of the business entity took place on July 23, 2019. The Chief Executive Officer (CEO) is Joseph Mori ("Mori") and the address is 31 Edge Hill Road, Wappingers Falls, NY, 12590.



*Figure 2 - New York State Division of Corporations Website Result*

18.     According to publicly available information obtained from the Bureau of Prisons and the United States District Court for the Southern District of New York, Mori served federal prison time for wire fraud and was prosecuted in the Southern District of New York. Mori's incarceration lasted for the duration of one year from 2022 through 2023. Public reporting also indicates that Mori was convicted in New York State courts in 2008 in connection with creating fraudulent insurance certificates.

19.     Thread Bank was able to freeze $701,394.06 of the original funds. On November 9, 2023, the funds were returned to Victim 1's bank account. About 10%, $78,205.94, of the original wire transfer remained unrecovered.

20.     I also reviewed a report from a property development company located in New York, New York, "Victim 2." As part of Victim 2's line of business, they are required to pay invoices for development projects, including architecture firms. Victim 2

received an email on or about July 17, 2023 from what appeared to be an architecture

firm providing services for a project in New Rochelle, New York with wiring instructions

for an invoice payment of $175,000. The email address that sent the wiring instructions

was created by changing the email domain from ramsa.com to rarnsa.com (changing the

"m" to the letters "r" and "n") to impersonate the legitimate sender.

21.    The fraudulent email included instructions to send the funds to Robert A.M.

Stern Architects, LLP, Mountain America Credit Union, 706 S. Main St., Logan, UT

84321, and account # XXXXXXXX1663. Victim 2 attempted to send this wire but the

wire was rejected. The perpetrator followed-up with an additional request on July 28,

2023 advising Victim 2 to re-send the funds via ACH to a JP Morgan Chase Bank, 31

Edge Hill Rd., Wappingers Falls, NY 12590, account # XXXXX5532. Victim 2 sent the

funds on July 28, 2023 and later inquired to perpetrator impersonating the legitimate

person why the account was titled Crypto Calypso, Ltd. and not RAMSA. The

perpetrator responded that it is a subsidiary account.

22.    On July 31, 2023, Victim 2 recognized that they were the victims of a BEC

scam and filed an IC3 complaint. IC3 is a public service maintained by the federal

government for victims of computer crimes to file complaints. JP Morgan Chase was able

to freeze and return $152,466 of the $175,000 that was sent. $22,534 of the original wire

transfer remains unrecovered.

23.    JP Morgan Chase Bank account ending in 5532 in the name of Crypto

Calypso, Ltd. includes Joseph Mori as a signer and the address as 31 Edge Hill Rd.,

Wappingers Falls, NY 12590. BEC funds that were wired to this account were

immediately used for personal expenditures including a vehicle payment, purchases at a local gas station, self storage payment, purchases at Amazon, and transfers to two linked JP Morgan Chase bank accounts.  Records from JP Morgan Chase show the following. The first account, ending in 5189, is titled Global Office Group, Inc. and lists an address of 31 Edge Hill Rd., Wappingers Falls, NY 12590.  One of the signers on the account is Joseph Mori.  The second account, ending in 7950, is titled to Joseph Mori and lists an address of 31 Edge Hill Rd., Wappingers Falls, NY 12590.

24.    During a telephonic interview conducted by TFO Pugmire regarding BEC Funds from Victim 1 detailed above, Mori said Global Office Group Inc. is an Information Technology ("IT") company that is involved in setting up and maintaining blockchain servers, web hosting, and general IT services. Global Office Group Inc. utilized the Thread Bank account for its financial needs. The Thread Bank account was frozen after the fraudulent wire transfer was conducted.

25.    According to Mori, he sells Bitcoin (BTC) cryptocurrency as a secondary way of obtaining funds. Mori offers the procurement and sale of Bitcoin to customers who may not be able to obtain an account on a legitimate cryptocurrency exchange. Mori describes his customers as people with red flags. He further described people with red flags as those that don't have passports, Social Security Numbers, or have other issues that would preclude them from gaining user accounts at a legitimate cryptocurrency exchange.

26.    Mori recalled seeing the wire transfer from Victim 1 come into his bank account with a note related to the settlement. According to Mori, it is not uncommon for

him to receive into his account funds that he was not expecting. He assumed the
$779,600.00 was related to his BTC business and transferred $50,000.00 to a US Bank
account also in the name of Global Office Group Inc. The bank account listed the account
address 31 Edge Hill Road, Wappingers FL, New York, 12590.

27.     In other words, by MORI's own admission, he is engaged in receiving
money on behalf of people with red flags who cannot obtain legitimate accounts, and
transmitting that money to third parties on their behalf so they can purchase
cryptocurrency. Further by his own admission, he uses the accounts of his business
Global Office Group to conduct this money transmitting. According to FinCEN records,
neither Mori nor his businesses, including Crypto Calypso, Ltd. and Exseedingly
Consulting, Inc., are licensed to conduct transactions on the behalf of others as a money
service business.

**UnlicensedMoney Transmitting through Crypto Calypso and Exseedingly**

28.     In addition to Mori's own description of his activities as operating an
unlicensed money transmitting business, we have conducted an investigation of his
businesses Crypto Calypso, Ltd. and its successor, Exseedingly Consulting, Inc. The
investigation includes, among other things, review of financial records for these and
related businesses, review of recordings of "town halls" Mori held with investors in these
businesses, review of his cryptocurrency wallet, and an undercover operation.

29.     Under Title 31, United States Code, Section 5330 and accompanying
regulations, any person who owned or controlled a money transmitting business ("MTB")
must have registered the business (whether or not the business is licensed as a money

transmitting business in any state) with the Secretary of the Treasury not later than the

end of the 180-day period beginning on the date on which the business was established.

This registration is accomplished with the Financial Crimes Enforcement Network

("FinCEN"), a bureau of the Treasury Department.

30.     FinCEN's mission is to safeguard the United States financial system from

illicit use and combat money laundering and promote national security through the

collection, analysis, and dissemination of financial intelligence and strategic use of

financial authorities.  FinCEN carried out its mission, in part, by receiving and

maintaining financial transaction data, and analyzing and disseminating that data for law

enforcement purposes.  FinCEN is responsible, in part, for detecting and deterring

financial crime.  Throughout the course of the investigation, Joseph Mori, Global Office

Group Inc., Exseedingly Consulting, Inc., and Crypto Calypso, Ltd. maintained bank

accounts at several different U.S. financial institutions.  At no point were Mori, Global

Office Group, Inc., Crypto Calypso, Ltd., Exseedingly Consulting, Inc., or Synergy

Services Group, Inc. registered as an MTB with FinCEN.

31.     The wife of an investor in Exseedingly Consulting (the investor himself has

medical issues) contacted law enforcement.  She directed the law enforcement agents to

recordings of three town halls held by Joseph Mori. I have reviewed those recordings and

recognize as Joseph Mori the voice and image of the person who identifies himself in the

recordings as Joseph Mori.

32.     In his townhalls, Mori described his business, which was essentially to

receive U.S. dollars from someone who wanted to purchase cryptocurrency but was not

permitted to do so through the normal exchanges, and to transfer their money to someone

willing to sell them cryptocurrency. Mori also received the cryptocurrency from the seller

into his trezor wallet, and transferred it to the cryptocurrency purchaser. He acted as a

middleman and charged a commission of between 1% and 10% of the transaction. Here is

a rough transcription of an excerpt from one recording where he describes the business

operation:

> So I'll get, let's say a gentleman approaches me , I want to sell some coin .
> And then I have another person that says, I want to buy some coin . But the
> two can 't never agree on procedures. So I'm the middleman. So what I'll do
> is I'll work out a deal with each side. And let's just say, just for argument's
> sake, it's a million dollar deal. So I'll book, I'll get the person that has the
> coin ready, get all the paperwork together . The person then wants to buy
> the coin, get t hem ready, get all the paperwork together . They'll prove up
> what they have. So each side will show me what they got. Then I'll have the
> person will send me the coin and then the other person send me the money.
> Once I receive both, I'm basically acting almost as an escrow, but I'm not a
> lawyer. But escrow like. And then so then I'll send each side their
> respective, money and coin. And then I make a percentage of that
> transaction . So let's just say 2%. So out of a million dollars, I'll make a 2%
> transaction fee without having to actually put up any money of my own.
> But I also guarantee the deal because I'll tell both sides, listen, I have a
> million dollars sitting in the bank right now. Here it is. If either side doesn't
> perform, I can kick it in and take it. So that makes everybody comfortable.
> If I have to do proof of funds, I could do it. You know, you know, if one
> side doesn't want to do something, I can always do it myself. So I get it all
> taken care of . And that's that's it. I'll do this multiple times a day . So, you
> know, if you do 2%, do it five times a day, it's 10% a day. It adds up to a lot
> of money in a month . Now there are some deals which are more lucrative
> than others . Like for instance , when I do business with people in, let' s say,
> Africa , they can 't buy a coin , you know, in Africa , most places . So
> they'll wire me the money and then I'll get them the coin. And those
> transactions, you know, usually I charge 10% because it's, you know, it's a
> bigger deal.

33.    As indicated above, Mori repeatedly told investors that all the U.S. dollars

and cryptocurrency flowed through him and his trezor device. He showed them the trezor

device in at least one of the town hall recordings but referenced it in all three recordings available to law enforcement. He assured investors that all the funds and coin flow through him: "There's no risk of losing a coin because everything goes through me anyway. So unless both sides perform, the coin doesn't move." He told investors he was sharing the commissions he earned on these transactions with them. In other words, if he transmitted a million dollars and 1,000 coins, he would get between 2% and 10% of the million dollars.

34.    In his townhalls, Mori also told investors that if they wanted to transfer money to third parties, they could. The following is an exchange from a recording of a town hall believed to have occurred on or about February 19, 2025, which was provided to law enforcement:

> JOSEPH MORI: If if somebody wants to send money to a third party, in this case, she [a spouse] would be a third party to you .
> A.S.: Mhmm
> JOSEPH MORI: You can do that . We just don't automatically send it out.
> A.S.: Mhmm
> JOSEPH MORI: So what we would need if you did, if you put a withdrawal request and the name didn't match, we would just need a letter. It could be an email from you stating that you were sending the money to a third party, um, just for legal purposes. That's all.

35.    He similarly reported in that townhall, "I pay to any account you want. You to tell me each time you make a withdrawal, where you want it to go, and that's where I send it."

36.    Mori also repeatedly assured investors that he was not complying with KYC or reporting their withdrawals to the government:

- When investors asked whether he reports his clients to the government, "I haven't I don't report any clients to the government. . . . So there's no direct reporting of any, any individual or company thereof. That's the way I handle it. So I, so that's how you handle it."

- When asked, he assured them he performed no KYC: "We don't have KYC functionality just yet."

- "We don't do criminal checks. I'm not saying anybody here is a criminal, but we don't do checks for criminality."

- Investor: So if you tell me KYC is optional, then I might be able to invest, but if it's mandatory, that's an issue. Joseph Mori: Well, currently, it's not being implemented at this time.

37.     In townhalls, Mori acknowledges that in New York, where he lives (and operates), those activities are highly regulated. ("So like in New York, New York State is probably one of the worst states in the country for crypto because they consider everything money. So New York is a very difficult state to do this, which happens to be where I live."; "There's a few of them that have specific rules to crypto and you would need to get what they call a money transmittal license, but that's the only license you would need to do it in those states"; Now if you were to say because somebody from New York puts money in, New York has draconian laws when it comes to crypto, would we be subject to those laws? Technically no, but one could make that argument and create a lot of problems for us, but that's why we're moving it overseas to eliminate that problem.")

38.     Mori also acknowledged that, in an effort to avoid the New York money transmitting and cryptocurrency laws, he registered Exseedingly Consulting, Inc. in Montana. ("But we're registered in Montana and Montana has very favorable crypto rules.")

39.     Those Montana business registrations are public. Nowhere on those Exseedingly business registrations does he disclose that his primary business location is in New York. (He similarly tells investors that they have an office in Montana, when it appears they have none). Instead, the Exseedingly business registration indicates that the physical address of the principal office is the same address as the registered agent's in Montana. But Mori's activities related to this cryptocurrency scheme appear to be located exclusively in New York, where he and his trezor device were found. In other words, the registration of his business in Montana appears to be a knowing and willful attempt to evade and violate money transmitting business regulations for cryptocurrency exchanges.

40.     According to the Montana.gov regulations published on their website, https://banking.mt.gov/moneytransmitters, "The Montana Division of Banking and Financial Institutions (Division) does not regulate money transmitters.  However, this does not mean that your company – a money transmitter – doesn't need any licenses in Montana unless the only thing you are doing is money transmission.  Which, inconveniently, is not defined under Montana law," and goes on to say "Montana also licenses escrow companies." So, according to Mori's own description of these businesses, there is probable cause to believe that Crypto Calypso and Exseedingly are engaged in the business of unlicensed money transmitting.

## Investment Fraud Scheme

41.     As indicated above, bank records revealed that Joseph Mori is the principal of the business Crypto Calypso, Ltd.  Based on the public facing website,

cryptocalypsoinvest[dot]com, Mori presents the business as "… an international crypto company engaged in crypto trading activities, which are related to trading on financial markets and cryptocurrency exchanges.  Our goal is to provide our investors with a reliable source of high income, while minimizing any possible risks and offering a high-quality service, allowing us to automate and simplify the relations between the investors and the trustees."  The contact information for the site shows an office address of 31 Edge Hill Rd., Wappingers Falls, NY 12590 and a contact of jmori@gony[dot]net.

42.    The website offered investors unrealistic returns. For instance, in an archived version of the website from March 19, 2024, Crypto Calypso was offering investors three options: (a) a 100% return on investments of $250,000 over 30 days, (b) a 40% return on investments between $1,000 and $2,000,000 every 30 days, and (c) a 100% return on investments between $5,000,000 and $50,000,000 every thirty days.[1]

43.    Due to the unrealistic returns promised and Mr. Mori's criminal history, we investigated this offering as a potential Ponzi scheme, and sought to determine how it operated. The website had a contact page, which directed interested parties to contact phone number 845-809-2011, email address jmori@gony[dot]net, or mailing address 31 Wappinger Falls, New York 12590.

44.    IRS-CI initiated an undercover operation to "invest" in Crypto Calypso, Ltd. in a covert fashion.  On July 24, 2024, an IRS-CI undercover agent contacted Joseph

---

[1] This archived copy of the website was downloaded from a publicly available website that archives internet websites. It is available at https://web.archive.org/web/20240319212043/https://www.cryptocalypsoinvest.com/. In my training and experience the archived webpages here are reliable copies of the websites as they appeared, though some widget and photos may not get captured or render perfectly.

Mori at jmori@gony[dot]net.  Initial instructions provided by Mori instructed the UCA to direct fiat funds to accounts at Brite Bank and later PNC Bank, both of which were rejected.  The UCA inquired about investing directly using cryptocurrency which Mori stated that he could.  Mori provided bitcoin address bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z (hereinafter "bc1que") to the UCA via email on July 31, 2024.  The UCA sent approximately $1,008.15 via Bitcoin to the bc1que address August 1, 2024 and cleared on August 2, 2024 (tx. hash ac75fae7866fe85143b0aefeaff26dad0652323961985ebd04d11da2cc43feda).  Mori acknowledged that he received the funds on August 8, 2024.  Mori also stated that "I [Mori] buy and sell crypto and make money on the commission, not the profit on the coin."

45.    On August 7, 2024, Mori transferred approximately $847.86 of BTC from his wallet, bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z, to his CashApp account (tx. hash 7fd7e38603a13b0bd183dbd365cb16a21e0aed6093f38306953598ced2217c0f).  Mori's CashApp account ending in XXXXXXXpyhm is registered to Mori at his residence, 31 Edge Hill Rd., Wappingers Falls, NY 12590.  Subpoena records indicate that logins to the account at this time are associated with a device titled "Joseph's S20 Ulra."  IP data provided from CashApp indicates that the account was accessed using a Verizon Business Internet Service Provider from both a browser and "Joseph's S20 Ultra," using IP address 173.62.81.236.  The account was also accessed by a T-Mobile Internet Service Provider from "Joseph's S20 Ultra," using IP address 172.58.299.216.

46.    On August 8, 2024, Mori represented that the UCA would receive a 20%

return on his investment after approximately 30 days.  Mori also stated that the UCA

could reinvest his earnings for an additional 20% in another 30 days.  The UCA requested

that Mori repay him the initial investment plus 20% return (approximately $1,200) to an

address provided by the UCA in Utah.  The UCA received an email from Novo Bank on

September 12, 2024 stating that a $1,200 payment was being sent by Synergy Services

Group, Inc. to the address the UCA provided to Mori.

47.    On or about September 12, 2024, the UCA sent a wire transfer for $2,000

from the District of Utah to Joseph Mori at a Novo Bank (Middlesex Federal) account

ending in 6792.  The account was provided by Mori and was titled to Synergy Services

Group, Inc.  The address on this account was 31 Edge Hill Rd., Wappingers Falls, NY

12590.

48.    The UCA invested approximately an additional $3,000.70 via Bitcoin to the

bc1que address as directed by Mori.  The transaction was sent and cleared on September

12, 2024 (tx. hash

15693f5ba72006c17a32ab2b20e048d6e484fc66017d43623010b2cd35bac54a).

49.    On September 12, 2024, Mori transferred approximately $3,027.01 of BTC

from his wallet, bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z (bc1que), to his

Coinbase account ending in 3d91 (tx. hash

b38012607643ddf414bb483eb71dff46487a1f4a314ce30fa61e9360864a77db).  Records

provided by Coinbase list bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z as "Trezor-

JM," in the production.  Based on my training and experience, the account holder can

"annotate" addresses or transactions personally for convenience.  The account holder for this account is Joseph Mori and lists his address as 31 Edge Hill Rd., Wappingers Falls, NY 12590.  The account was verified with Mori's "selfie" photo and driver's license. Mori is the only signer listed on the account.  Mori converted the BTC to USDC and spent it at E-Z Pass, Tivo, Adobe, Amazon Marketplace, and Verizon.

50.     On or about October 7, 2024, the UCA received a check from a Synergy Services Group, Inc. bank account at Middlesex Fed. Savings ending in 6792.  The UCA attempted to deposit the check but it was rejected for insufficient funds.  When confronted about this via email, Mori stated that he "rarely use[s] that account and something hit that I was not aware of," and signed the email Joseph.  He stated on October 31, 2024 that he would repay the UCA $7,200 via BTC.

51.     On or about December 17, 2024, Mori made a repayment to the UCA via BTC from his wallet bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z for approximately $1,197.47 (tx. hash 1e161675e6502803c32f0213d7d9bfcbe6573e8ca19189eec30d68f453394cf3).  This payment was funded, in part, by a Binance.US account XXXX4215 owned by Jeffrey Hull, a resident of Wisconsin.  Based on my training and experience, it is common in Ponzi schemes for participants to be repaid with other victims' funds.

52.     On or about December 18, 2024, Mori made a repayment to the UCA via BTC from a wallet bc1q7zesnszs7cx6a069pa8076d444s4gd8y7fmjsc for approximately $6,009.64 (tx. hash b479e7cdc1c492071f3148509d0f33a90f07aedadc04b5bbf2cfea2234d32cb3).  This wallet

was funded in part by a BTC transfer from ChangeHero.io.  Records provided by

ChangeHero.io imply that the recipient address is a Trezor device.  Mori confirmed to the

UC that he sent the repayment back to him.  ChangeHero.io is a cryptocurrency exchange

service that enables users to swap crypto assets without KYC.  The payment was also

funded, in part, by a transfer from HitBTC.com – Changelly.com.

53.    One of the BTC addresses that Mori provided to the UC was bc1que which

can be attributed to cluster ID bc1q4de797ksltdy0taqg5vcgau45lmk40wfjruzkf

containing 25 additional addresses.  This cluster has been active on the Blockchain from

March 8, 2022 through April 14, 2025.  A total of $766,120.96 was received by this

cluster and a total of $763,877.06 has been sent out.

54.    We have determined that Mori discontinued the use of the

cryptocalypso.com website around December 2024, but continued the operation under the

name "Exseedingly Consulting Group" on a publicly available website,

"exseedinglygroup[.]com." The website for Exseedingly Group contains substantially the

same graphics and information as the prior Crypto Calypso website. It also similarly

offers outrageous returns over short periods, such as an 81% return in 30 days, a 500%

return in 90 days, and so forth. These offerings appear to change periodically.

*Misrepresentations to Investors about Volume of Business*

55.    Because the investors' return was based upon his commissions, which were

in turn based upon a percentage of the transactions he facilitated, transaction size and

volume was would be important to investors. As outlined below, Mori repeatedly misled

investors about the volume of his business.

56.    According to Mori's own statements, the volume of transactions he facilitated would be reflected in his trezor wallet. On the January 13, 2025 town hall he mentioned the trezor wallet to investors and said that's what he uses:

> Oh, and by the way, I use hardware wallets, which I have in my possession. It looks like this. Does anybody want to buy one? It's called a Trezor. They have other companies that make it. My lawyer, my wife, and my brother have the code to that wallet . So if something should happen to me , they are able to get whatever is on there off.

57.    In the February 19, 2025 town hall, Mori shows the trezor and states that he does not use large commercial exchanges like Binance or Coinbase for his business, but the trezor:

> I use, now when you' re dealing with hot wallets, it's different types, you got exchanges like Coinbase, Binance, you know, big, large corporations that manage the , you know, millions of wallets . And, you know, they, you know, you know that the coin is safe because they're not going anywhere . I don 't use those . Then there's also other like trust wallet, you know, little companies that have come and set up wallets, you know, on their own , and they're pretty reliable . You know, they have good following and stuff . But then there's also these other like generic web based wallets, which I just shy away from because, you know, it's one, probably one guy running the whole show and you never know what's going to happen. But then what I use is hardware wallets . So hardware wallets, since I got the video, I'll show you basically. So I use a Trezor, which looks like this . So I keep everything on here . The nice thing about it, it can't be hacked, because unless you have the physical device, you can't get anything off of it.

58.    Mori was arrested in New York on June 11, 2025. On the same day, a search warrant was executed at his home pursuant to a search warrant. During the course of that search, we located two trezor wallets, a white one and a black one. The black one appears to be consistent with the one he shows investors in his videos. (The white trezor was examined and appeared to reflect no transactions after 2023.)

59. Law enforcement agents were able to access and analyze Mori's black trezor wallet. The trezor wallet contains data reflecting the history of Mori's cryptocurrency transactions from 2022 to 2025.

60. The data contradicts Mori's claims to investors. The trezor wallet data indicates he sent out just 37 cryptocurrency transactions during the entire year of 2024. The total value of the cryptocurrency transferred out of his wallet during 2024 was just $73,387.58.

61. In contrast, during investor town halls and in his offerings on his website, Mori misleadingly suggested that he was doing many millions of dollars in cryptocurrency exchanges during this period and about two transactions per day.

62. For instance, in the January 13, 2025 town hall, Mori suggested he had access through his private network to a market of billions of dollars of cryptocurrency transactions:

Investor: Okay, I 'm back . Yeah, it sounds like there' s certainly no shortage of capital potentially flowing in. So my question is at what point do you run out of counterparties to do transactions with?

Mori: Excellent question. Let's just say the average Bitcoin deal for let's say, I mean, if you just do a thousand coins, Bitcoin is roughly, you know, it's approaching again, $100,000. So, you know, you do a thousand coins, that's a hundred million dollars . That's just, that's a thousand. If you 10,000, that' s a billion dollars . I routinely get asked to do deals of those sizes. So the, you know, to go into the billions is not an issue . That's, I got the market for that. So that's fine. And because it's all done in crypto, it's, I'm not moving a billion dollars in cash, I'm moving a billion dollars in crypto, which makes life a lot easier.

Investor: Wow, okay.

Mori: I mean, I'm not there yet. I mean, I'd like to be, but I'm working on it.

63.     During that town hall, Mori indicated he had facilitated a hundred million dollar purchase of cryptocurrency: "The maximum transaction size I've done so far has been, I think it would have been a thousand coins at a hundred million."

64.     But according to the trezor data, the largest transfer of cryptocurrency from the trezor prior to the January 13, 2025 townhall was a transfer of approximately $65,000 worth of Bitcoin on December 19, 2023.

65.     The largest cryptocurrency transfer from his trezor wallet at any time prior to its June 11, 2025 seizure was a February 11, 2025 transfer of $255,000 worth of USDC on the Ethereum network. For the period of transactions reflected in the trezor—from March 8, 2022 through the June 11, 2025 date of seizure—the trezor transferred out just three transactions involving more than $100,000 in cryptocurrency. Thus, Mori's claim that he had conducted a $100,000,000 cryptocurrency-for-cash exchange appears to be false.

66.     During the February 19, 2025 town hall, Mori confirmed he was offering at that time a 500% return in a month, requiring a minimum investment of $500,000. That implies a return of $2,500,000 in 30 days. At the 10% commission rate, that implied to his investors that would be able to do at least $25,000,000 of cryptocurrency sales in a month. Again, for the entire year of 2024, Mori had transferred just $73,387.58 in cryptocurrency.

67.     In a third town hall, Mori told investors that the most he had paid out to someone was $1.2 million. The Trezor reflects no record of any payout in that amount.

The Exseedingly Consulting bank records reflect no transfer in that amount (although there is a receipt of $1.6 million).

68. An archived version of the website on July 10, 2025,[2] invites investors to invest up to $100,000,000 for 90 days, and promises a 600% return on that money. That 600% quarterly return—a 2,400% annualized rate return—implies an ability to return $600,000,000 to investors in 90 days. See the snip below:



_____

[2] This archived version is publicly available from an online source that is, in my training and experience, reliable.

69.     Because he was soliciting investments of up to $10,000,000 (or sometimes $100,000,000) in his business, and claiming he was funding the investors' returns from his commissions, investors were interested in and asked about the volume of exchanges Mori engaged in. He provided false information. This presents probable cause to believe he engaged in wire fraud. In addition, because the returns were based on investors' passive investment on Mori's claimed efforts, the investment offers were securities. This presents probable cause to believe he engaged in not only wire fraud, but also securities fraud.

*Misrepresentations to Investors about their Returns*

70.     As indicated above, Mori reported to investors that their returns came from commissions of 1 to 10% of the value of cryptocurrency exchanges he facilitated. But the data on his trezor, and the investments he received indicate that he was actually paying out with investors' funds, while falsely representing that the funds represented the profits of success of his cryptocurrency exchange business.

71.     For instance, during the 30 day period following the undercover investments of approximately $2,000 and $3,000 in cryptocurrency for a 20% return on September 12, 2024, Mori's trezor wallet shows he engaged just two cryptocurrency transactions. The first was a receipt of approximately $480 worth of USDT-ETH (U.S. Dollar stablecoin on the Ethereum chain). The second was a transmission of that same

USDT-ETH out of the wallet on the same day. Assuming those transactions included a receipt of cryptocurrency currency from a selling customer and transfer to a buying customer, the maximum expected commission would be $48, not the $1,000 Mori implicitly promised.

72.     An analysis of Exseedingly Consulting banking records further provide reason to believe that the returns he is reporting to customers are not supported by the alleged commissions he is earning.

73.     For instance, we have obtained records for Exseedingly's account records at Santander bank for the period February 20 through May 14, 2025. Those records indicate that, in that period, Exseedingly took in at least $5,334,978.91 and transmitted out at least $4,448,010.66. This includes $959,800 transmitted by Exseedingly to accounts for Mori's businesses Global Office Group and Trusted Transportation. Each of those transmissions was made by wire in increments in excess of $10,000, in violation of 18 U.S.C. § 1957.

74.     During the same period, Mori's trezor wallet transmitted $2,193,650.51 worth of cryptocurrency elsewhere. Assuming, in Mori's favor, that every one of these transfers was a cryptocurrency exchange, this suggests (i) Exseedingly received approximately $2,193,650.51 in cryptocurrency from customers, (ii) Exseedingly received approximately $2.193,650.51 in cash payments for the cryptocurrency; (iii) Exseedingly earned at most $219,365 in commissions, and (iv) Exseedingly transferred out approximately $1,974,285.46 ($2,193,650.51 cryptocurrency price less commissions) to the customer selling the cryptocurrency. It further implies that the remainder of funds received--approximately $3,141,328.40—were investment funds from Exseedingly

investors during this period ($5,334,978.91 in deposits less $2,193,650.51 in customer

payments for cryptocurrency).

75. The following table summarizes these conclusions from the most favorable

assumptions concerning the Exseedingly account deposits:

| Exseedingly Deposits | Crypto. Sent by Trezor | Deposits Representing Cust. Payments for Crypto. | Remaining Dep. Representing Investor Funds | 10% Comm'n on Crypto Sale | As % of Investments |
|---|---|---|---|---|---|
| $5,334,978.91 | $ 2,193,650.51 | $ 2,193,650.51 | $3,141,328.40 | $ 219,365.05 | 7% |

76. The following table summarizes the conclusions from the most favorable

assumptions concerning the Exseedingly account withdrawals:

| Exceedingly Withdrawals | Distr. Of Crypto sale proceeds to custo. | Distr. To Mori Companies | Distro. To Investors | Available to pay investors | Shortfall - Initial investor funds missing |
|---|---|---|---|---|---|
| $4,448,010.66 | $1,974,285.46 | $ 959,800.00 | $1,513,925.20 | $886,968.25 | $740,434.95 |

77. Notably, the funds distributed to Mori's companies appear to be more than

three times the maximum commissions he could have earned from the cryptocurrency

activity on his trezor, based on his representations. This money must have come at the

expense of either his customers or his investors.

78. The $219,365 in commissions represents less than 7% profit on $3.1

million in investment over approximately 90 days. While a decent return, that is not the

kind of return Mori was promising investors. It is a fraction of it. And it is not the return

he was telling investors they had earned. Every investor we have interviewed has

indicated that Mori reported that they had earned back their investment and a return. For some investors, this was reflected only on paper, and they were still waiting their payouts.

79.    Law enforcement conducted interviews of multiple investors in Exseedingly Consulting, Inc. throughout the course of the investigation.  Investors— including investors in the District of Utah—confirmed that, when their investments matured per the plan they were subscribed to, their balances would be updated on their profile on Exseedingly Consulting, Inc.'s website.  In some instances, investors were able to withdrawal their principal and returns from the platform but, in many instances, investors were unsuccessful in withdrawing from the Exseedingly Consulting, Inc. platform.  Investors have made multiple attempts to withdraw from the platform and are unable to withdraw their principal or interest.

80.    In an email supposedly sent to all Exseedingly Consulting, Inc. investors by support@exseedinglygroup[dot]com on August 1, 2025, it was stated that "we are about 30 days out for withdrawal requests. While some that have been request went faster, our queue is over 1,000 requests so it will take a little time to get it done. The volume of messages has been preventing us from processing much as a lot of our time has been going to answer messages. I have made modifications on the software to allow us to better deal with withdrawals more efficiently. We also have a large deposit of crypto coming in soon that will help us clear out the cache of crypto requests. Based on our estimations on how long things take, we should be all caught up on the current requests within the next30 days. Be patient, everyone will be taken care of. We are moving as fast as we can."

81.     Additionally, the August 1, 2025 email to investors stated, "we are not going out of business as some of the rumors that have been circulating are saying. The huge volume of withdrawal requests caught us by surprise and are being addressed. We were not equipped to handle such large numbers. But we are expanding our back office to accommodate them for the current clients and for future growth."  It also stated, "we have had a few credit card chargebacks. Anyone requesting a charge back will have their account cancelled and their principle returned via the credit card company. They can take 30 days or more to issue a refund, that is not within our control."  The email ended with "We hope this quells some of the anxiety out there and know that we are working feverishly to get everything in order and completed."

82.     Mori was prohibited as a condition of pretrial release from engaging in transactions of $5,000 or more or working for himself. To our knowledge, however, he has never requested court permission to issue refunds or payments to his Exseedingly customer or investors. And, despite that court prohibition, he has spent more than $200,000 on new trucks since he was arrested, without notifying pretrial services or seeking court permission, as directed.

83.     In my training and experience, the foregoing presents probable cause to believe that Mori was falsely reporting to investors the returns on their investment and, when paying out profits, he was either using new investor funds or funds owed to customers to pay out investors.

## THE TARGET FUNDS

*Funds in Crypto Calypso, Ltd.'s, Exseedingly Consulting, Inc.'s, and Synergy Services Group, Inc.'s Accounts*

84.    Based upon the foregoing, there is probable cause to believe:

- Exseedingly was an unlicensed money transmitting business. All funds received from customers or investors were funds involved in operating or conducting an unlicensed money transmitting business in violation of 18 U.S.C. § 1960.

- Mori and his entity Exseedingly used the account to engage in money laundering, including by transmitting proceeds of a fraud to his other entities. These funds were proceeds of a scheme to defraud investors or customers or to obtain their funds through fraudulent statements.

85.    In our examination of the following accounts and wallets, we have identified the TARGET FUNDS that were received in the last year:

- Santander account ending in x7804 in the name of Exseedingly Consulting, Inc. (collected more than $5,334,978.91 in 2025)

- Santander account ending in x7812 in the name of Global Office Group, Inc. (received more than $305,000 from Exseedingly Consulting's Santander account x7804 in 2025)

- Santander account for Trusted Transportation Group Inc. ending in x7847 (received $200,000 from Exseedingly Consulting's Santander account x7804 in 2025; received from third parties more than

$122,661.82 in wires and transfers bearing descriptions indicating they were for Exseedingly in 2025)

86.     Because these accounts and the funds described were all received into those accounts within the last year, all funds in those accounts are subject to forfeiture without regard to tracing.

87.     There is probable cause to believe that all cryptocurrency on the trezor wallet is similarly property that was used in and involved in his unlicensed money transmitting business, wire fraud, and securities fraud.

88.     The following sums appear to remain on the trezor, and constitute less than was received in the trezor during this period:

- 0.433157 BTC

- 6,544.68 Tether USDT (Ethereum Blockchain)

- 506.0188 USDC (Ethereum Blockchain)

- 25.1978 ETH

- 5,005 USDT (Polygon Blockchain)

- 1,555 USDT

## **CONCLUSION**

Based on the foregoing, I respectfully submit that based on the above-cited authorities and information, probable cause exists to believe that the TARGET ASSETS are subject to restraint.

DATED: September 16, 2025

Digitally signed by Jonathan C. Helmstetter
Date: 2025.09.16 08:56:27 -04'00'

JONATHAN HELMSTETTER, Special Agent
IRS Criminal Investigations

Subscribed and sworn to before me this
16th day of September, 2025

Hon. DAPHNE A. OBERG
United States Magistrate Judge